**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| In re: ) | |
| ) | |
| DALMATIAN FIRE EQUIPMENT, INC., ) | Case No. 18-18332 MER |
| ) | |
| Debtor. ) | Chapter 11 |
| ) | |

**DISCLOSURE STATEMENT FOR DALMATIAN FIRE EQUIPMENT'S PLAN OF REORGANIZATION**

I.   **INTRODUCTION**

This is the disclosure statement (the "Disclosure Statement") in the chapter 11 bankruptcy case of Dalmatian Fire Equipment, Inc. ("Debtor"). This Disclosure Statement contains information about the Debtor and describes the Plan of Reorganization (the "Plan") filed by the Debtor on July 23, 2019. A full copy of the Plan is attached to this Disclosure Statement as **Exhibit A**.

Pursuant to the terms of the United States Bankruptcy Code, this Disclosure Statement has been presented to and approved by the Bankruptcy Court. Approval of the Bankruptcy Court is required by statute but does not constitute a judgment by the Court as to the desirability of the Plan or as to the value or suitability of any consideration offered under the Plan.

   A.   **Purpose of this Document**

The Debtor has prepared this Disclosure Statement to provide information sufficient to permit a creditor to make a reasonably informed decision in exercising the right to vote upon the Plan. The material here presented is intended solely for that purpose and solely for the use of known creditors of the Debtor, and, accordingly, may not be relied upon for any purpose other than determination of how to vote on the Plan.

This Disclosure Statement describes:

- The Debtor and significant events during the bankruptcy case;

- How the Plan proposes to treat claims or equity interests of the type you hold (i.e., what you will receive on your claim or equity interest if the plan is confirmed);

- Who can vote on or object to the Plan;

- What factors the Bankruptcy Court (the "Court") will consider when deciding whether to confirm the Plan;

- Why the Debtor and Plan Proponent believe the Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation; and,

- The effect of confirmation of the Plan.

Be sure to read the Plan as well as the Disclosure Statement. This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights.

B. **Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

The Court has not yet confirmed the Plan described in this Disclosure Statement. This section describes the procedures pursuant to which the Plan will or will not be confirmed.

1. *Time and Place of the Hearing to Confirm the Plan*

The hearing at which the Court will determine whether to confirm the Plan will take place on _____ __, 201__, at __:__ _.m., in Courtroom __, Fifth Floor, U.S. Custom House, 721 19th Street, Denver, Colorado 80202.

2. *Deadline for Voting to Accept or Reject the Plan*

If you are entitled to vote to accept or reject the plan, vote on the enclosed ballot and return the ballot in the enclosed envelope to Wadsworth Garber Warner Conrardy, P.C., attn. David J. Warner, Esq., 2580 W. Main St., Ste. 200, Littleton, CO 80120 (counsel for the Debtor). See section V.A. below for a discussion of voting eligibility requirements.

Your ballot must be received by _____ __, 2019 or it will not be counted.

3. *Deadline for Objecting to Confirmation of the Plan*

Objections to the confirmation of the Plan must be filed with the Court and served upon counsel for the Debtor by _____ __, 2019.

4. *Identity of Person to Contact for More Information*

If you want additional information about the Plan, you should contact David J. Warner, counsel for the Debtor, at (303) 296-1999 or dwarner@wgwc-law.com.

II. **DEFINITIONS**

Unless otherwise defined herein, capitalized terms used herein have the meanings ascribed thereto in the Plan (see Article I of the Plan entitled "Definitions").

III. **BACKGROUND**

A.  **Description and History of the Debtor's Business**

The Debtor is a small, closely-held Colorado corporation engaged in the refurbishment and sale of self-contained breathing apparatuses and cylinders. The Debtor's primary customers are fire departments and other emergency personnel throughout North America. Although small, the company has historically been profitable. The current owners of the Debtor purchased the company in 2007 and have operated it without incident until 2018.

From the 2007 purchase through the present, one of the Debtor's core principals is restoring people by providing opportunities for felons and people struggling with addiction to turn their lives around. Currently half of the employees in the Debtor's production group have felony records. Numerous others have passed through the company since 2007 and the Debtor estimates that its restorative program has about a 40% success rate. By placing such at-risk people in a team-based, supportive work environment, the Debtor endeavors, with considerable success, to provide its employees the means to become productive and stable members of society. In addition to its culture, the Debtor provides the economic support necessary for success: the company pays a living wage, which is typically higher than would otherwise be available to its employees, provides health insurance, provides paid vacations and holidays, and provides access to 401(k) matching funds.

B.  **Events Leading to Chapter 11 Filing**

The Debtor's survival was threatened in May 2018 when the Mississippi-based law firm of Rutledge and Davis, PLLC ("Rutledge") filed a "Class Action Complaint" in the United States District Court for the Northern District of Mississippi (the "Mississippi Lawsuit") alleging the Debtor transmitted one unsolicited facsimile advertisement to Rutledge in October 2017 in violation of the Telephone Consumer Protection Act of 1991, as amended by the Junk Fax Prevention Act of 2005, 47 U.S.C. § 227 (the "TCPA"). Extrapolating from this one alleged fax, Rutledge asserted that it and numerous other unnamed fax recipients "suffered actual damages" by, among other results, "forcing them to unnecessarily expend funds for paper and ink." Rutledge also sought "statutory damages." The TCPA provides a means for the imposition of a per fax statutory penalty of between $500-$1,500. While disputing the allegations, the Debtor estimated that its potential exposure in the Mississippi Lawsuit could be enormous.

The potential exposure was so extreme because Rutledge was a putative class representative in the Mississippi Lawsuit and the three law firms representing the Rutledge firm sought to certify a class on behalf of all recipients of faxes from the Debtor during the applicable limitations period. Nevertheless, Rutledge immediately struck up settlement discussions with the Debtor. While Rule 408 may bar admission of some settlement discussions for some purposes, it should come as no surprise that Rutledge's settlement proposals exceeded their maximum potential individual recovery of $1,500 by several hundred multiples.

The Debtor was thus faced with an untenable situation: it could either (a) endeavor to strike a deal with Rutledge for an amount hundreds of times greater than the statutory penalty for one violation of the TCPA while leaving the Debtor open to the risk that other potential claimants

could initiate an identical lawsuit or (b) expend its limited funds to engage counsel to litigate the Mississippi Lawsuit through the class certification process and trial and then, if the class plaintiffs prevailed, face a potentially catastrophic judgment that could never be satisfied absent bankruptcy relief.

Consistent with its principles, the Debtor chose neither course. The Debtor refused to be blackmailed into lining plaintiff's counsel's pockets or to stake the entire future of its company and employees on the outcome of the Mississippi Lawsuit. Instead, the Debtor filed its chapter 11 case when it remained financially viable, before the Mississippi Lawsuit was at issue, and before the class certification process had even begun. Through the chapter 11 case, Dalmatian planned to give notice of potential TCPA claims to each of the more than 65,000 recipients of its faxes, and thereafter to adjudicate any potential TCPA liability fairly, expeditiously, and economically through the chapter 11 process.

C. **Significant Events During the Bankruptcy Case**

Immediately after the filing of this bankruptcy case, the Debtor obtained approval for a credit facility of $250,000.00 (the "DIP Loan") to enable the Debtor to continue operating without interruption in the event the amount of its working capital became insufficient to support operations during the case. In December of 2018, Rutledge filed a Motion for Relief from Automatic Stay to Liquidate Class Action Claims (the "Stay Relief Motion"). Through the Stay Relief Motion, Rutledge sought to force the Debtor to return to Mississippi so that Rutledge could seek to certify a class and liquidate the TCPA claims. Rutledge also objected to the Debtor's motion to establish a bar date and to establish claims procedures. After a hearing on these disputed issues was held on January 9, 2019, the Bankruptcy Court ruled in the Debtor's favor on February 7, 2019 (docket No. 114). Pursuant to the Order, Rutledge "clearly failed to meet its burden of establishing cause for lifting the stay under § 362(d)." The Debtor's proposed claim procedures were also approved and a bar date of May 27, 2019 was established.

The Debtor then gave notice of the Bar Date to all its purported creditors and any potential TCPA claimants by serving the *Notice of Order Establishing Procedures and Bar Date for the Filing of Proofs of Claim Pursuant to Fed. R. Bankr. P. 3003(c)(3)*, *Corrected Order Establishing Bar Date for the Filing of Proofs of Claim Pursuant to Fed.R.Bankr.P. 3003(c)(2)* (docket no. 128), and *Official Form B410: Proof of Claim* in the following manner: (a) published notice of the Bar Date in the Wall Street Journal's national edition on February 21, 2019; (b) faxed notice to over 1,000 fax numbers for which the Debtor lacked physical addresses; (c) mailed notice to any potential creditors listed in its Amended Exhibit E filed on February 26, 2019 (docket no. 136); and mailed notice to approximately 60,000 addresses of potential TCPA claimants. The Debtor's diligent efforts to give potential claimants notice of the Bankruptcy Case appeared to be successful because the Bankruptcy Court, the Debtor, and undersigned counsel received hundreds of inquiries regarding the notice given.

Only 12 claims were filed by the Bar Date. Excluding the $1.5 million mortgage of an affiliated entity which the Debtor agreed to guaranty, $75,329.58 in claims were filed, of which $42,590.00 are disputed. None of the potential TCPA claimants, including Rutledge, filed a proof of claim in this matter.

During the pendency of the Bankruptcy Case, the Debtor also obtained authorization to settle and pay potential claims of taxing authorities in the various states in which the Debtor operates. The Reorganized Debtor shall not be liable to repay any pre-petition amounts allegedly owed to any taxing authorities listed on the Debtor's Amended Schedule E/F: Creditors Who Have Unsecured Claims ("Amended Schedule E") filed on February 26, 2019 at docket no. 136. On February 26, 2019, the Debtor amended its Schedule E to include the names and addresses of several taxing authorities who may assert Claims against the Debtor for unpaid sales, franchise, and other corporate taxes. Such claims were listed as "unknown." On February 26, 2019, complete copies of Amended Schedule E, the Notice of Amendment to Schedule, and the Notice of Meeting of Creditors were mailed to the addresses listed in Amended Schedule E (docket no. 137). Notice of the Bar Date was also published once in the national edition of the Wall Street Journal. On February 26, 2019, the Debtor served a copy of the Notice of Order Establishing Procedures and Bar Date for the Filing of Proofs of Claim Pursuant to Fed. R. Bankr. P. 3003(c)(3), Corrected Order Establishing Bar Date for the Filing of Proofs of Claim Pursuant to Fed.R.Bankr.P. 3003(c)(3) (Docket No. 128); and Official Form B410: Proof of Claim on all creditors included in Amended Schedule E (docket no. 153). None of the taxing authorities added to the Amended Schedule E filed claims even though they received notice. Pursuant to Fed.R.Bankr.P. 3003(c)(2), only creditors who are not schedule or who are listed as holding disputed, contingent, or unliquidated claim must file a claim in order to share in distributions and be entitled to vote to accept or reject a plan. Although "unknown" is not synonymous with "disputed, contingent, or unliquidated," it is obvious that the statutory evidentiary presumption as to the validity and amount of a claim cannot apply to a claim scheduled as "unknown." *In re Sabbun*, 556 B.R. 383, 388 (Bankr. C.D. Ill. 2016).

    D.    **Projected Recovery of Avoidable Transfers**

The Debtor does not intend to pursue preference, fraudulent conveyance, or other avoidance actions because it does not believe that any exist. In any event, creditors without disputed Claims will be paid-in-full through the Plan.

    E.    **Claims Objections**

Except to the extent that a Claim is already allowed pursuant to a final non-appealable order, the Debtor reserves the right to object to Claims. Therefore, even if your Claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your Claim is later upheld. The procedures for resolving Disputed Claims are set forth in Article X of the Plan.

    F.    **Current and Historical Financial Conditions**

The identity and the Debtor's estimate of the fair market value of the estate's assets as of the Petition Date are listed in Debtor's Schedules A and B which were filed with the Bankruptcy Court. The most recent monthly operating report filed by the Debtor with the Bankruptcy Court is included as **Exhibit B**. The Debtor's June 2019 Monthly Operating Report states that the Debtor had $299,690.27 in cash on hand at the end of June 2019. Along with the amount available to it under the previously approved DIP Loan, the Debtor has sufficient funds available to pay all amounts due on the Effective Date of the Plan.

## IV. SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

1. **What is the Purpose of the Plan of Reorganization?**

As required by the Code, the Plan places claims and equity interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of claims or equity interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

A. **Unclassified Claims**

Certain types of claims are automatically entitled to specific treatment under the Code. They are not considered impaired, and holders of such claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code. As such, the Plan Proponent has *not* placed the following claims in any class:

1. *Administrative Expenses*

Administrative expenses are costs or expenses of administering the Debtor's Chapter 11 case which are allowed under § 507(a)(2) of the Code. Administrative expenses also include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcy petition. The Code requires that all administrative expenses be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.

The following chart lists the Debtor's estimated administrative expenses and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
| --- | --- | --- |
| Expenses Arising in the Ordinary Course of Business After the Petition Date | None | Paid in full on the Effective Date of the Plan, or according to terms of agreement with creditor if later |
| The Value of Goods Received in the Ordinary Course of Business Within 20 Days Before the Petition Date | None | Paid in full on the Effective Date of the Plan, or according to terms of obligation if later |
| Professional Fees, as approved by the Court. | Wadsworth Garber Warner Conrardy P.C. fees of approximately $15,000.00. | Paid in full on the Effective Date of the Plan, or according to separate agreement, or according to court order if such fees have not been approved by the Court on the Effective Date of the Plan. |

| Clerk's office fees | None | Paid in full on the Effective Date of the Plan |
|---|---|---|
| Other administrative expenses | None | Paid in full on the Effective Date of the Plan or according to separate written agreement |
| Office of the U.S. Trustee Fees | None | Paid in full on the Effective Date of the Plan |
| **TOTAL** | **$15,000.00** | |

    2.    *Priority Tax Claims*

Priority tax claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code. Unless the holder of such a § 507(a)(8) priority tax claim agrees otherwise, it must receive the present value of such claim, in regular installments paid over a period not exceeding 5 years from the Petition Date.

The following chart lists the Debtor's estimated § 507(a)(8) priority tax claims and their proposed treatment under the Plan:

| Description (name and type of tax) | Estimated Amount Owed | Date of Assessment | Treatment |
|---|---|---|---|
| Colorado Department of Revenue for Sales Taxes | $900.00 | | Paid in full on the Effective Date |

During the pendency of this bankruptcy case, the Debtor sought and obtained Court approval to enter into and pay any amounts negotiated under voluntary disclosure agreements with several state and local taxing authorities. See docket nos. 149 and 164. The terms of any such agreements are incorporated in the Plan. As set forth in more detail in Section 7.1 of the Plan, the Debtor shall not be liable to pay any pre-petition taxes, claims, penalties, or interest allegedly due to any state or local taxing authority that did not timely file a proof of claim in this bankruptcy case.

    B.    **Classes of Claims and Equity Interests**

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

    1.    *Classes of Claims*

The following charts list all classes containing Debtor's prepetition claims and their proposed treatment under the Plan:

| Class 1 ||
|---|---|
| Creditor: | ANB Bank |

| | |
|---|---|
| Total Claim as of Petition Date: | $1,510,237.06 |
| Insider? | No |
| Impaired? | No |
| **Treatment** ||
| Class 1. (*Allowed Unimpaired Unsecured Claim of ANB Bank*). The Debtor entered into a Guaranty (Continuing Debt – Unlimited) (the "Guaranty") with ANB Bank on February 2, 2017. Under the Guaranty, the Debtor guaranteed payment and performance under a separate loan agreement between ANB Bank and an affiliated corporate entity, 75 Oak Ave., LLC. Although Claim 4-1 filed by ANB Bank on December 28, 2018 lists ANB Bank's claim as a Secured Claim, ANB Bank's claim is not actually secured by any property owned by the Debtor and is therefore an Unsecured Claim. Upon information and belief, ANB Bank will soon file an amended claim to acknowledge that its claim is unsecured. As of the Petition Date, the amount due under the loan guaranteed by the Debtor was $1,510,237.06. The underlying loan is not in default and is fully secured by real estate owned by 75 Oak Ave., LLC. Under this Plan, the Guaranty shall not be modified, shall remain in effect, and the Debtor's obligations under the same remain unchanged. ||

| | |
|---|---|
| **Class 2** ||
| Creditor: | Erin Livingstone |
| Total Claim as of Petition Date: | $937.50 |
| Insider? | No |
| Impaired? | Yes |
| **Treatment** ||
| Class 2. (*Priority Wage Claims Under 11 U.S.C. § 507(a)(4)*). Any creditors holding priority wage Claims under 11 U.S.C. § 507(a)(4) shall receive cash on the Effective Date equal to the allowed amount of such Claim(s). The only priority wage claim is that of Erin Livingstone in the amount of $937.50. ||

| | |
|---|---|
| **Class 3** ||
| Insider? | Yes as to 75 Oak Ave., no as to all others |
| Impaired? | No |
| **Treatment** ||

Class 3. (Executory Contracts and Unexpired Leases). Any unexpired leases or executory contracts not otherwise dealt with in the Plan shall be deemed rejected. Under the terms of any lease agreements, in the event that a lease is rejected, the equipment or property will be returned to the lessor, unless Debtor and the lessor otherwise agree. Any Class 3 claimant asserting a claim for damages arising from rejection of an executory contract or unexpired lease shall file a proof of claim with the Bankruptcy Court by the later of the Effective Date or thirty days after entry of the Order granting the motion to reject or the claim shall be forever barred. The claims held by holders of rejected leases or executory contracts shall be treated as Class 4 Unsecured Claims subject to the limitations of Section 502 of the Bankruptcy Code.

On or about March 17, 2017, the Debtor (as lessee), King Buick GMC (as lessor), and ACAR Leasing, Ltd. (as assignor of the lessor) entered into a motor vehicle lease (the "Motor Vehicle Lease"). Pursuant to the Motor Vehicle Lease, the Debtor pays monthly for the use of a 2017 GMC Sierra pick-up truck (the "Truck"). Pursuant to 11 U.S.C. § 365, the Debtor may assume or reject executory contracts and unexpired leases as part of a chapter 11 plan.[2] The question of whether to assume or reject an unexpired lease is one of business judgment of the debtor. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d. 1303, 1309 (5th Cir. 1985); *In re Lady Baltimore Foods, Inc.*, 2004 WL 2192374, *2 (Bankr. D. Kan. August 13, 2004); *In re the Beare Co.*, 177 B.R. 879, 882 (Bankr. W.D. Tenn. 1994). With regard to assumption or rejection, a presumption of reasonableness attaches to the debtor's management decisions. *Lady Baltimore*, 2192734 at * 5. The debtor need only demonstrate that the assumption of a lease will benefit the estate. *Id.* at *6; *Beare Co.*, 177 B.R. at 882. In the exercise of the Debtor's sound business judgment, the Debtor has determined that the Motor Vehicle Lease is a benefit to the estate and that continued use of the Truck and the option to purchase the Truck at the end of the Motor Vehicle Lease will be beneficial to the Debtor's business operations. The Debtor anticipates paying its creditors in full through the Plan. Thus, rejection of the Motor Vehicle Lease would only lead to a claim for damages that the Debtor would be obligated to pay. The Debtor is current on all of its obligations under the Motor Vehicle Lease. Accordingly, no amounts are due pursuant to 11 U.S.C. § 365 to cure any defaults as a condition precedent to the assumption of the Motor Vehicle Lease. In the alternative, the Debtor and King Buick GMC and/or ACAR Leasing, Ltd. may terminate the Motor Vehicle Lease on such terms as are agreed upon by both parties subject to the monetary amount limits of Section 7.6 below.

The Debtor is a party to pre-petition real estate leases with affiliated entities 14 Oak, LLC and 75 Oak Ave., LLC. The Debtor was not in default of any payment obligations under the real property leases on the Petition Date and has remained in compliance with the same throughout this bankruptcy proceeding. The lease with 14 Oak, LLC expired at the end of May, 2019 and all of the Debtor's operations are now located at 75 Oak Avenue. The Debtor's prepetition lease with 75 Oak Ave., LLC was amended on January 15, 2019. The Debtor is current on all of its obligations under the lease. Accordingly, no amounts are due pursuant to 11 U.S.C. § 365 to cure any defaults as a condition precedent to assumption. In the exercise of the Debtor's sound business judgment, the Debtor has determined that the lease with 75 Oak Ave., LLC is a benefit to the estate. The Debtor assumes its lease with 75 Oak Ave., LLC through the Plan and 75 Oak

---

2. "An assumption or rejection may also be accomplished as part of a Chapter 11 plan, obviating the need to file a separate motion as a contested matter." *In re Nat'l Gypsum Co.*, 208 F.3d 498, 511–12 (5th Cir.2000); 11 U.S.C. § 1123(b)(2)." *In re Amerivision Commc'ns, Inc.*, 349 B.R. 718, 722 (B.A.P. 10th Cir. 2006).

> Ave., LLC has informed the Debtor that it stipulates and agrees to assumption.
>
> On the Petition Date, the Debtor was a party to a Client Services Agreement (the "CSA") with CoAdvantage, a professional services organization. Under the CSA, the Debtor outsources employee management tasks, such as employee benefits, payroll, worker's compensation, and payroll taxes. The Debtor was not in default of its obligations under the CSA on the Petition Date. Nevertheless, in order to ensure that its interests were adequately protected, CoAdvantage required that the Debtor provide a $75,000.00 deposit (the "CoAdvantage Deposit") with CoAdvantage to be used to fund the Debtor's employee management obligations in the event of a default by the Debtor. On September 27, 2018, the Debtor filed a motion to authorize the Debtor to provide the CoAdvantage Deposit as adequate protection to be refunded upon confirmation of the Debtor's Plan (docket no. 14). The Court granted the Debtor's motion on October 4, 2018 (docket no. 27) and the Debtor made the CoAdvantage Deposit. The Debtor is current on all of its obligations under the CSA. Accordingly, no amounts are due pursuant to 11 U.S.C. § 365 to cure any defaults as a condition precedent to assumption. In the exercise of the Debtor's sound business judgment, the Debtor has determined that the CSA is a benefit to the estate and should be assumed. CoAdvantage shall refund the CoAdvantage Deposit no later than 21 days after the Confirmation Date.

| **Class 4** | |
|---|---|
| Creditors: | Various |
| Impaired? | Yes |
| **Treatment** | |

> Class 4. (*Impaired and Unimpaired Unsecured Claims*). Class 4 is comprised of creditors with or asserting Unsecured Claims against the Debtor, including any allowed penalty Claims held by any taxing authority which are not related to actual pecuniary loss. Allowed Class 4 Claims shall be paid: (a) according to the original terms of the pre-petition agreement with such creditor; (b) as otherwise agreed by the creditor; or (c) on the Effective Date, in full, final, and complete satisfaction of their Unsecured Claims, as set forth in the chart below. Distributions to Class 4 claimants shall not exceed the amount of the Allowed Unsecured Claims plus interest calculated pursuant to the terms of any pre-petition agreements or if no interest rate is included, two and a half percent (2.5%) per annum. The Class 4 creditors who have timely filed Unsecured Claims or were listed as creditors are as follows:
>
> The Debtor may file motions to disallow any Unsecured Claims listed as "Disputed" and shall treat such claims in accordance with the Bankruptcy Court's ruling on such motions and subject to the provisions of this Plan.

| Name of Claimant | Amount of the Proof of Claim or Schedule F | Amount Owed Pursuant to Debtor's Records | Description | Status | Treatment |
|---|---|---|---|---|---|
| Waas Campbell Rivera Johnson & Velasquez, LLP | $4,900.00 | $4,400.00 | Legal Services / Claim 3-1 | Disputed | If Allowed – paid on the Effective Date or when Allowed |
| Fire Protection Equipment Co. | $1,113.00 | $778.00 | Goods Sold / Claim 5-1 | Disputed | If Allowed – paid on the Effective Date or when Allowed |
| Hudson Fire Protection District | $1,930.00 | $0.00 | Goods Sold / Claim 6-1 | Disputed | If Allowed – Paid on the Effective Date or when Allowed |
| John W. Abel | $7,382.50 | $0.00 | Goods Sold / Claim 7-1 | Disputed | If Allowed – Paid on the Effective Date or when Allowed |
| Wilderness Volunteer Fire Department, Inc. | $187.50 | $0.00 | Goods Sold / Claim 8-1 | Disputed | If Allowed – Paid on the Effective Date or when Allowed |
| Illinois Union Insurance Company | $7,616.00 | $0.00 | Insurance Premium / Claim 12-1 | Disputed | If Allowed – Paid on the Effective Date or when Allowed |
| State of Maine, Maine State | $3,865.00 | $0.00 | Goods Sold and Warranty / Claim 9-1 | Disputed | If Allowed - paid on the Effective Date or when |

| | | | | | |
|---|---|---|---|---|---|
| Prison | | | | | Allowed |
| Digital Wave Corporation | $38,725.00 | $36,525.00 | Services Performed / Claim 10-1 | Disputed | If Allowed – paid on the Effective Date or when Allowed |
| Carole R. Simmons | $686,032.65 | $682,798.43 | Loan / Schedule F | Allowed | Paid according to terms of original pre-petition agreement |
| Chalybeate Fire and Rescue | $4,365.00 | $4,365.00 | Goods Sold / Schedule F | Allowed | Paid on Effective Date |
| Chase Ink Card | $6,974.65 | $0.00 | Loan / Schedule F | Disputed | If Allowed – Paid on the Effective Date or when Allowed |
| Custom Coatings, LLC | $975.00 | $975.00 | Goods Sold / Schedule F | Allowed | Paid on Effective Date |
| Daniel Simmons | $42,917.10 | $42,917.10 | Loan / Schedule F | Allowed | Paid according to terms of original pre-petition agreement |
| David Simmons | $42,917.10 | $42,917.10 | Loan / Schedule F | Allowed | Paid according to terms of original pre-petition agreement |
| Elan Card | $12,293.53 | $0.00 | Loan / Schedule F | Disputed | If Allowed – Paid on the Effective Date or when |

|  |  |  |  |  | Allowed |
|---|---|---|---|---|---|
| Fire Trader | $1,100.00 | $1,100.00 | Services Performed / Schedule F | Allowed | Paid on Effective Date |
| First Insurance Funding Corp. | $4,365.26 | $0.00 | Services Performed / Schedule F | Disputed | If Allowed – Paid on the Effective Date or when Allowed |
| Gallegos Sanitation, Inc. | $319.66 | $0.00 | Services Performed / Schedule F | Disputed | If Allowed – Paid on the Effective Date or when Allowed |
| Jefferson-Como Fire Department | $1,729.50 | $1,729.50 | Services Performed / Schedule F | Allowed | Paid on Effective Date |
| Kevin L. Simmons | $111,184.23 | $111,184.23 | Loan / Schedule F | Allowed | Paid according to terms of original pre-petition agreement |
| North St. Paul Fire Department | $2,500.50 | $2,500.50 | Goods Sold / Schedule F | Allowed | Paid on Effective Date |
| Russell Kates | $12,609.79 | $12,609.79 | Loan / Schedule F | Allowed | Paid according to terms of original pre-petition agreement |
| The Fire Store | $4,779.50 | $4,779.50 | Goods Sold / Schedule F | Allowed | Paid on Effective Date |
| UE Compression | $356.80 | $356.80 | Goods Sold / Schedule F | Allowed | Paid on Effective |

| | | | | | Date |
|---|---|---|---|---|---|
| Unishippers | $3,811.99 | $0.00 | Services Performed / Schedule F | Disputed | If Allowed – Paid on the Effective Date or when Allowed |

2. *Classes of Priority Unsecured Claims*

Certain priority claims that are referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Code are required to be placed in classes. The Code requires that each holder of such a claim receive cash on the Effective Date of the Plan equal to the allowed amount of such claim. However, a class of holders of such claims may vote to accept different treatment.

There are no claims under §§ 507(a)(1), (4), (5), (6), and (a)(7) of the Code or proposed treatment under the Plan other than the claim listed above in Class 2.

3. *Classes of Equity Interest Holders*

Equity interest holders are parties who hold an ownership interest (*i.e.*, equity interest) in the Debtor. In a corporation, entities holding preferred or common stock are equity interest holders. In a partnership, equity interest holders include both general and limited partners. In a limited liability company ("LLC"), the equity interest holders are the members. Finally, with respect to an individual who is a debtor, the Debtor is the equity interest holder.

The claims of Equity Interest Holders are treated under Class 5 of the Plan. On the Effective Date, the shareholders of the Debtor shall retain their Equity Interests. The "Absolute Priority Rule" of 11 U.S.C. § 1129(b) is not applicable where, as is expected here, the class of unsecured creditors has accepted the Plan. "[I]f a class of creditors accepts the plan under section 1129(a)(8), the bankruptcy court may confirm the plan without showing that the plan satisfies the 'unfair discrimination' and 'fair and equitable' standards of section 1129(b)." *In re Ruti-Sweetwater, Inc.*, 836 F.3d 1263 (10th Cir. 1988).

Any late filed claims are treated under Class 6 of the Plan and are disallowed. The Debtor is not aware of any late filed claims.

| Class 7 ||
|---|---|
| Creditors: | Hexagon Digital Wave, LLC |
| Impaired? | Yes |
| **Treatment** ||
| Class 7 (*Hexagon Digital Wave, LLC*). On the Petition Date, the Debtor was a party to a supply agreement (the "Supply Agreement") with Hexagon Digital Wave, LLC ("Digital Wave") dated ||

> June 1, 2017 and amended on December 21, 2018. Under the Supply Agreement, Debtor acts as a reseller of used SCBA equipment that Digital Wave refurbishes. Because there is no requirement of future performance by the Debtor under the Supply Agreement, the Agreement is not an executory contract requiring assumption or rejection.
>
> Until recently, Digital Wave's refurbished equipment was certified under a special permit from the Department of Transportation ("DOT"). In 2019, DOT terminated the special permit. As a result, used equipment sold pursuant to the Supply Agreement is no longer certified by a federal regulatory agency. Digital Wave represents to the Debtor that it is challenging the permit termination through appropriate federal administrative processes and hopes to have the permit reinstated. However, unless and until the permit is reinstated, the Debtor is saddled with unsellable inventory and the prospect of customer complaints relating to the equipment sold prior to the permit termination. In addition, Digital Waves asserts both pre-petition general unsecured and post-petition administrative claims against the Debtor relating to unpaid invoices for product delivered to the Debtor to the Supply Agreement. The Debtor asserts that unless the DOT permit is reinstated, the product has no value. The Debtor therefore reserves the right to object to the claims asserted by Digital Wave. In the event any general unsecured claim is allowed, such claim will be treated as a Class 4 claim and paid as provided in the treatment of Class 4. In the event any Administrative Claim is allowed, the Claim will be paid on the fifth day of the next calendar month after the date upon which such Claim is Allowed
>
> The Debtor also reserves the right to bring claims against Digital Wave under the Supply Agreement arising out of the sale of product that is no longer subject to the DOT special permit.

C.  **Means of Implementing the Plan**

Payments and distributions under the Plan will be funded by the following: Debtor's operations, a previously approved debtor-in-possession loan, and/or capital contributions or additional loans.

D.  **Tax Consequences of Plan**

**Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, and/or Advisors**.

V.  **CONFIRMATION REQUIREMENTS AND PROCEDURES**

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Code. These include the requirements that: the Plan must be proposed in good faith; at least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible. These requirements are <u>not</u> the only

requirements listed in § 1129, and they are not the only requirements for confirmation.

### A. **Who May Vote or Object**

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

In this case, the Plan Proponent believes that Classes 2 and 4 are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan.

#### 1. *What Is an Allowed Claim or an Allowed Equity Interest?*

Only a creditor or equity interest holder with an allowed claim or an allowed equity interest has the right to vote on the Plan. Generally, a claim or equity interest is allowed if either (1) the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest. When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

***The deadline for filing a proof of claim in this case was May 27, 2019.***

#### 2. *What Is an Impaired Claim or Impaired Equity Interest?*

As noted above, the holder of an allowed claim or equity interest has the right to vote only if it is in a class that is *impaired* under the Plan. As provided in § 1124 of the Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

#### 3. *Who is **Not** Entitled to Vote*

The holders of the following five types of claims and equity interests are *not* entitled to vote:

- holders of claims and equity interests that have been disallowed by an order of the Court;

- holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting

purposes.

- holders of claims or equity interests in unimpaired classes;

- holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code;

- holders of claims or equity interests in classes that do not receive or retain any value under the Plan; and

- administrative expenses.

***Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan [and to the Adequacy of the Disclosure Statement].***

    4.    *Who Can Vote in More Than One Class*

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

    B.    **Votes Necessary to Confirm the Plan**

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes, as discussed later in Section [B.2.].

    1.    *Votes Necessary for a Class to Accept the Plan*

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

    2.    *Treatment of Nonaccepting Classes*

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner prescribed by § 1129(b) of the Code. A plan that binds nonaccepting classes is commonly referred to as a "cram down" plan. The Code allows the Plan to bind nonaccepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of § 1129(a)(8) of the Code, does not "discriminate unfairly," and is "fair and equitable" toward each impaired class that

has not voted to accept the Plan.

*You should consult your own attorney if a "cramdown" confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.*

### C. **Liquidation Analysis**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation. Here, the Debtor proposes to pay all creditors in full on the Effective Date, pursuant to the applicable pre-petition agreement, or separate agreement by the creditor.

### D. **Feasibility**

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

#### 1. *Ability to Initially Fund Plan*

The Plan Proponent believes that the Debtor will have enough cash on hand on the Effective Date of the Plan to pay all the claims and expenses that are entitled to be paid on that date.

#### 2. *Ability to Make Future Plan Payments And Operate Without Further Reorganization*

The Plan Proponent must also show that it will have enough cash over the life of the Plan to make the required Plan payments.

As shown in its most recent Monthly Operating Reports, the Debtor will have sufficient cash from operating revenue and the debtor-in-possession loan to pay its creditors as set forth in the Plan.

## VI. EFFECT OF CONFIRMATION OF PLAN

### A. **Discharge of Debtor**.

Discharge. On the Effective Date of the Plan, the Debtor shall be discharged from any debt that arose before confirmation of the Plan, subject to the occurrence of the Effective Date, to the extent specified in § 1141(d)(1)(A) of the Code, except that the Debtor shall not be discharged of any debt (i) imposed by the Plan, (ii) of a kind specified in § 1141(d)(6)(A) if a timely complaint was filed in accordance with Rule 4007(c) of the Federal Rules of Bankruptcy Procedure, or (iii) of a kind specified in § 1141(d)(6)(B). After the Effective Date of the Plan your claims against the Debtor will be limited to the debts described in clauses (i) through (iii) of the preceding

sentence.

### B.   Modification of Plan

The Plan Proponent may modify the Plan at any time before confirmation of the Plan. However, the Court may require a new disclosure statement and/or revoting on the Plan.

The Plan Proponent may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated *and* (2) the Court authorizes the proposed modifications after notice and a hearing.

### C.   Final Decree

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Plan Proponent, or such other party as the Court shall designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case. Alternatively, the Court may enter such a final decree on its own motion.

## VI.   MANDATORY DISCLOSURES

The Bankruptcy Code requires disclosure of certain facts:

(a)   There are no payments made or promises of the kind specified in Section 1129(a)(4)(A) of the Bankruptcy Code which have not been disclosed to the Court.

(b)   The Reorganized Debtor will remain in control of the assets after confirmation of the Plan for the purpose of operating the business of the Reorganized Debtor. The current management of the Debtor, Kevin Simmons and Russel Kates, will remain in control of the Reorganized Debtor. The monthly salary of Kevin Simmons will remain at $2,000.00 per month plus 3.625% of cash collected with routine increases during the pendency of the Plan. The monthly salary of Russell Kates will remain at $2,000.00 per month plus 4% of cash collected with routine increases during the pendency of the Plan. The Debtor believes that their continued control is in the best interest of all creditors as described in Section 1129(a)(5) of the Bankruptcy Code.

## IX.   CONCLUSION

The materials provided in this Disclosure Statement are intended to assist you in voting on the Plan of Reorganization in an informed fashion. Since, if the Plan is confirmed, you will be bound by its terms, you are urged to review this material and make such further inquiries as you may deem appropriate and then cast an informed vote on the Plan.

DATED July 23, 2019.

DALMATIAN FIRE EQUIPMENT, INC.

By: Kevin Simmons

Its: Chief Executive Officer

WADSWORTH GARBER WARNER CONRARDY, P.C.

/s/David J. Warner
David V. Wadsworth, #32066
David J. Warner, #38708
2580 W. Main St., Ste. 200
Littleton, CO 80120
(303) 296-1999, Fax: (303) 296-7600
ATTORNEYS FOR DALMATIAN FIRE EQUIPMENT, INC.